May it please the court, counsel. My name is Jerry Cuomo. I represent the National Railroad Passenger Corporation, also better known as Amtrak. On this appeal today, we are asking this court to reverse the district court's denial of Amtrak's motion for judgment as a matter of law pursuant to Rule 50B and also on the issue of the submissibility of punitive damages. Also at issue on the appeal is our denial of our motion for a new trial. I'd like to focus my argument today, subject to the court's questions of course, on the JMLL issues. So I would like to start with the foreseeability and duty issues which are inextricably bound together. Obviously, this case is tragic, involves the heinous, unprovoked shooting of Mr. Aaron on Amtrak's Missouri River on a runner train by the defendant Marquise Webb. Tends to be that these cases that involve unknown criminal assailants, they all have heinous facts. Unfortunately, it's those heinous facts and the unprovoked nature of the crime that made it unforeseeable to Amtrak under Missouri law. The Seventh Circuit just grappled with this issue in a case called Scott versus Wendy's, which involved a drive-by shooting at Wendy's. And what the Seventh- Is that in your briefs? That is in the briefs. It's in our- Okay, good. Proceed. Sorry. It's in our reply brief. I thought it was a post-brief. But go ahead. Proceed. It's in our reply brief, Your Honor. And there the Seventh Circuit observed the tragedy of the assault that the plaintiff suffered, brazen, unprovoked, and extraordinary in its violence, is precisely why Wendy's could have not reasonably foreseen the occurrence. That is, at the end of the day, the result that we think this court should reach in this case, despite the tragic facts. Counsel, I did have a question about the record, pertains to the facts. In the appellee's brief, it says the shooter, Mr. Webb, was wearing a firearm on his hip when he boarded, and that he passed the conductors with it. Is there any evidence in the record that any Amtrak employees were aware of that? There, the evidence in the record is that they were not aware of that. The, while he may have had it on, he had it on his waist, or at least that's what he said, it was concealed. And- I'm sorry, did you say it was concealed, or what did you say? It was under his clothing. It was not visible. Okay. Open carry, I think, is legal in Missouri in some ways, but proceed. Right, against, it is against Amtrak's policy for non-law enforcement to have firearms on a train, that's in the record. So generally, just talking about, obviously, Judge Benton, you're very familiar with Missouri law on this issue. Generally, there's no duty to protect against the criminal acts of unknown assailants. And this court has said, Nostraga versus Dugan, that's because it's rarely foreseeable. There's a very defined body of Missouri law on when it becomes foreseeable with unknown assailants. And that is when there have been prior similar crimes, in sufficient number, on the premises where the plaintiff was victimized. Many court appeals cases say near. Well- There's several Missouri court appeals cases that say in or near. Right? They're cited by both of you. Go ahead. So, I would say though, your honor, and I know that the cases that you're talking about are pre this court's cases. So, in our brief, we cite, for example, Nostraga versus Dugan, which I think was a Judge Wiley case. Where actually, in the opinion, the court used emphasis when citing the test to say the prior crimes have to be on the premises. So, I understand there are cases that you're talking about, your honor, but the way this court has interpreted Missouri law. It's the premises where the plaintiff was victimized. So, there's some discussion in the briefs that Amtrak's a common carrier. Yes. And that the highest duty then applies. Yes. I forget the language. Does that change that rule that you just described at all, or how do those two concepts or two rules interact? Yeah, so obviously, as a common carrier, the test is highest duty. It's certainly a heightened standard. So, what does that mean? It doesn't mean anything vis-a-vis the issue in this case. So, it doesn't mean anything? I mean- Not in this case. Not in this case. If there is a foreseeable event, certainly, then I would say, your honor, the heightened duty would sort of come into play. But, I mean, since foreseeability and duty are so closely linked in Missouri, it seems to be at least. I mean, you're saying that for a common carrier, foreseeability is what matters, not the duty. So, the test in Missouri, we've cited some cases in our brief on this, is even though a common carrier, airline, Amtrak, and any sort of railroad that has passenger traffic, the test is still, you have a heightened duty to protect, but it only applies to events that are foreseeable. So, vis-a-vis the foreseeability of an event, your honor, it's the same analysis. So, unforeseeable events, a common carrier doesn't have any duty to protect the passengers against that. So, it falls into sort of the same group of cases where you're dealing with non-common carrier businesses. So, the evidence trial here, the court's obviously seen all of the submissions and the evidence that went in over our objections about prior crimes. So, let's just look at what those are. The main argument that they made at trial was that the Lincoln service, we have two lines that have been mentioned in the briefs, the Lincoln service and then the Missouri River runner. They're two separate and distinct services. Lincoln service goes from Chicago to St. Louis. And you have to board, and then if you want to go on to Kansas City, you board the Missouri River runner. Two blocks from here, go ahead. Yes, yeah. So, if you look at those premises only, if you look at the Missouri River runner, at trial there was evidence of one prior crime. And there's a lot of briefing on this. It was just a passenger brandishing a knife. Didn't make contact with, did not injure a conductor under Missouri law. That's not a violent crime. No one's excusing it, but it's not a violent crime that would somehow make this random, unprovoked shooting of Mr. Aaron foreseeable. We don't believe the court should look at what happens on the Lincoln service because, in our view, it's a separate premise. But if you were- Both got on in normal Illinois? Do I understand it right? The record is Mr. Aaron and Mr. Webb both boarded in normal Illinois. So, surely it's relevant from normal, right? I know normal's not Chicago, I'm aware. Correct, but it also was not the particular train where the crime happened, of course. But, Your Honor, to your point, to your point, Judge, if you do consider the Lincoln service as part of the relevant premise, in the record, there is no evidence of any crime whatsoever on the Lincoln service. So, if you'd look at those two lines right there, that's the end of the inquiry under Missouri law. There is simply no, there's certainly no prior murder. There is certainly no gun-related crime. Certainly none involving the shooting of anybody. Certainly none involving the discharge of a firearm. All you have is the one crime on the River Runner where the passenger brandished the knife. That's it. So, of course, plaintiffs understood that at trial, so they tried to broaden the scope of what the relevant premises are. So, they made, over our objection, they brought in an expert to testify about general crime statistics in Chicago, St. Louis, and Kansas City. Kansas City, an RV was irrelevant because that stop was after the shooting happened. But, let's just look at Chicago and St. Louis. Were both passengers ticketed all the way to Kansas City? I believe so, Your Honor. I believe they were. You do indicate on Amtrak where your destination is. Yes, you do. They do, and they put placards on the seat and everything. Yeah. But their argument, if you look, their expert used this exact phrase, that this shooting was foreseeable to Amtrak because the trains travel through hotbeds of crime. That's the exact kind of argument that, which essentially that boils down to, Amtrak should have foreseen this shooting because it operates in high crime areas. That is the, almost verbatim, the exact kind of argument that the Missouri courts, and this court, have held does not make any and all crimes foreseeable just because you operate in areas of high crime. There is a case out of this court called Ship, which we said, I think Judge Brodger were on that panel, where the plaintiff was doing door-to-door solicitations for a company. They sent her out into, what is it, a known high crime area. She was kidnapped and murdered. This court found that there was no foreseeability because there hadn't been any prior similar crimes in that area. That is really dispositive of that argument, that just because we travel through hotbeds of crime, which I don't think anybody disputes, Amtrak goes through areas that are high crime areas, that doesn't make this shooting foreseeable. The other things that they cite are, there's obviously this spreadsheet in the record that is very hard to read unless you magnify it. Those are crimes that Amtrak actually has data about and that they've tracked in Missouri and Illinois. Now, there's 77 crimes on that spreadsheet, as the court may have observed. There's only four or five that actually happen in Missouri. None of them involve any crimes on the Lincoln service. None of them involve any crimes on the Missouri River Runner. And if the court were to take a look at some of those crimes, they are not crimes that would in any way, shape, or form make, let's call this what it is, assassination, it was an assassination. There are no crimes on that spreadsheet that Amtrak tracked that would remotely make it foreseeable. How many of the 77 were in Chicago where Amtrak owns the station, right? Many of them were in Chicago Union Station, yes. And Amtrak does own or manage or some way control that station, right? Yeah, there's been a lot of briefing on that. So we own Chicago. Right. There are some interim stations that we own. We don't own any in Missouri though, right? We don't own any. None in Missouri, right? We own no stations in Missouri. It's one of the few states where that is true. And yeah, so judge, if you were to look at the spreadsheet and, you know, they put in record the actual police reports for a lot of those crimes. Counselor, I'm sorry, I got off in the folklore and not on the question. The question was, how many of the 77 were in Chicago? I didn't total up how many are in Chicago, but most of them are in Illinois. I mean, I've gone through them myself. I think there's a lot that are in Union Station. Some of the ones that are, some of the more interesting ones. And the exhibit speaks for itself, for sure. Yeah, it does. And there's no doubt, your honor, there's a lot of crimes in Chicago. But if you look at those crimes, there is, for example, two gentlemen got in a fight in a taxi line, okay? Somebody was upset that their fries at the McDonald's were not to their liking. And they assaulted or splashed water on the manager of the McDonald's. Amtrak employees in the break room get into a verbal altercation. Now, those are, no doubt, crimes that we tracked. But no court in Missouri would say that crimes like that, that Amtrak tracked, would somehow make this shooting, this assassination, foreseeable. Now, on that spreadsheet, there are crimes that are identified as involving guns. And they seize on that, and they try to tell the court that there was a multitude of firearm events, that Amtrak, firearm-related crimes. But again, if you look at the detail of those crimes, none of them involved discharge of a firearm on a train. So a good example would be, there was one where someone hid a firearm under their pillow on one of the overnight trains. Wasn't discharging it, it was possession of a firearm. There was even another incident where it was labeled as a gun-related crime, but after the APD investigated it, the person didn't possess a firearm. So even to the extent that they try to tell this court that there are firearm-related crimes that Amtrak tracked, nothing resembles what happened on the River Runner, unfortunately, to Mr. Aaron. I have five minutes reserved for rebuttal. I'd like to move on to another topic, unless the court has more questions about foreseeability and duty. Second, the first part of the plaintiff's claims are all the claims that deal with lack of security. Those are claims that, if there is no foreseeability, the district court respectfully should have granted judgment as a matter of law. There's another class of claims that they have that are related to the inadequacy of our investigation and the timing of us discovering that Mr. Aaron was unfortunately shot. On those issues, you can see in our brief, we're relying on an absence of causation. And I'll use this term, I'm not sure if it's exactly the right term, but medical causation. Under Missouri law, they need to have an expert come in and testify that, but for Amtrak's actions, the plaintiff would have died. Would not have died, rather. And I think they embrace that standard. They admit that that's the standard. But what happened at trial is their medical expert came in and testified on direct, testified on cross, and testified on redirect, that Mr. Aaron only had, at best, if everyone did everything that plaintiff contends we should have. He only had a four to 14% chance of surviving. Nowhere in the trial record did their medical expert, Dr. Brokish, say, Mr. Aaron, if Amtrak had done A, B, and C, he would have survived. Our medical expert, for what it's worth, said there was a 100% chance of mortality. They cite a section of the trial transcript where they claim Dr. Brokish had some testimony about that. What Dr. Brokish did say is that Mr. Aaron was a muscular gentleman. The bullets would have done less damage than they would have for somebody else who's less muscular. That falls far short of saying that Mr. Aaron would have survived. So on those claims, I don't think the court needs to dive into the minutia of the adequacy of the investigation and things like that because there's no causation. I'll reserve the remainder of my time. I reserve the remainder. Thank you, Your Honor. Mr. Sternberg. May it please the court, Jonathan Sternberg for the Appellee, Rayanna Aaron. I want to start off with something Judge Kobes, you asked my opponent about common carrier and the highest duty of care and whether that changes anything. You still have to show foreseeability, no question about that. The difference, though, is that the highest duty of care means what a very cautious person, that's what Missouri law says, the Crane case from 1998 that we cite in our brief, what a very cautious person would anticipate. Was the jury charged with those words? The jury wouldn't ever be charged with any of these words. The jury isn't charged with determining foreseeability like this. This is a question of law. Of course, but what facts lead to that? What facts were the jury charged with? And so in the end, this does turn on foreseeability. So I want to talk very briefly about violent crime and what that means. The actual Missouri standard for premises liability, which will heighten that to a very cautious person, is from the LAC case. Page 259 of the opinion, it's whether there's evidence of, quote, criminal acts that would put reasonable and prudent people on notice that precautions should be taken. My opponent argues that the prior crimes on either the Lincoln service or the whole Missouri River Runner, which is the Lincoln service, and as Judge Benton, you noted, both parties got on in Illinois and were traveling to Kansas City. So this is pretty common. But regardless, he said that none of these qualify as violent crimes. I disagree. In the LAC case from 2002, the opinion from the Missouri Supreme Court goes into a series of prior crimes that were held to be violent crimes, from which it should be anticipated that there, in that case, would be a sexual assault. None of the more sexual assault, and that was, of course, what the defendants there argued. They said it wasn't foreseeable because this wasn't sexual assault. Among those are pulling knives, pushing people down, pulling guns without, you know, brandishing them, which he just said to this Court is not a violent crime. Those are violent crimes. I don't know if any runners have ever had a gun pointed at you or a knife pulled on you, but those are certainly violent crimes. How about, I mean, my recollection is there's evidence of one prior violent crime on the route, on the River Runner, I think. Now, maybe that implicates the question of what the premises means and how broad that is. But, I mean, violent crimes on the train, am I correct that there was one involved a knife? So on this particular part of the River Runner, yes. It's in 2020, only a year before that this happened, where a, which Amtrak, in their own report, branded an aggravated assault. It was where a man brandished a knife at a conductor and threatened to stab her. That's a violent crime, Your Honor. The question here, again, is whether there are. Where did that occur? I don't recall from the brief. December 2020. Yeah, where? Oh, in Independence, which is the very station where Mr. Starran was killed. So this may not be relevant. Are knives prohibited on Amtrak trains? Yes, firearms are prohibited. I don't know if knives are. Actually, I shouldn't say that. I'm not sure it's relevant. I don't think it is relevant. The question is, is this something that would be foreseeable? And I also disagree with my opponent that there weren't other prior crimes on the river, on the Amtrak trains themselves that Missouri would consider violent crimes, both in Illinois and Missouri. If you look at pages 498 to 500, and I grant it is a small type that can be hard to read, there is a list of where these crimes occurred, what they were, and whether they were on the train or at a station. There are a number of them, including in Kansas City, on the train, assault, Kansas City, on the train, battery, Joliet, which is very close to normal, where both of the parties here got on, assault, battery. How many of the 77 were in Chicago? A goodly number, I think. I don't have an exact answer either. The point is that this is a moving premises. This is a premises that starts in Chicago, goes through St. Louis, goes to Kansas City. Anywhere along there, the question is would a reasonable person in Amtrak's position, in fact a very cautious person in Amtrak's position, be on notice that a shooting could occur? And we don't have to speculate about that at all because Mr. Cook, Amtrak's own security agent on pages 443 to 44 of the transcript, testified that it was foreseeable. Now in their third brief, they say, well, he didn't really say it's foreseeable. In response to a question about foreseeability, he just said it's possible. Again, I point the court back to Missouri law about what that means. In the LAC case on page 259 of the transcript, just, of the opinion, just after saying what that standard is, criminal acts that put a reasonably prudent person on notice, the court held that the security official at Ward Parkway Mall in Kansas City, that his testimony, that yes, they knew a sexual assault was possible, was sufficient testimony. And the fact that they guarded against that, that they sought to train their people to be vigilant for this, and they failed to do that. Well, here you have the same testimony from Mr. Cook, that Amtrak knew that this was possible, that in fact they trained their people on the trains to deal with active shooters. So is this something that a reasonable entity in Amtrak's position, especially one with the highest duty of care, what a very cautious person would know, would be on notice, might occur? Of course it was, because they planned for it. And then you also have testimony from Mr. Mulcrone, which I'll note they don't mention in their third brief at all. He was Amtrak's train manager for this part of the country, who managed these trains. He testified on pages 297 to 98 of our separate appendix, which the jury also heard that deposition as well, that when he heard about Mr. Aaron's shooting, he said, you know, this is effed up is the language he used, because there had already been another shooting on the train before. He'd warned them that they needed more security, and they hadn't done it. This is foreseeable to someone in Amtrak's position. The question then that they really want to get into is about breach. But breach, of course, is a question of fact, not of law. They say that, well, the duty, you know, if that's the case, we didn't show that the duty was that they had to have metal detectors, or that they had to have wanding, or that they had to have more security on the train. But the duty that they owe, if the court accepts that this was foreseeable, if the court agrees with me, then the duty that Amtrak owed was to exercise the degree of care that a reasonably prudent person would use under the circumstances. What that winds up being, whether they breached that duty, becomes a question of fact. And we had evidence, of course, that they had no officers on this 500-mile line. They engaged in no enforcement of their own firearms ban. The fact that they have a firearms ban itself just goes to show how foreseeable this was. And industry standards and own policies are absolutely relevant in that regard. They own, they've known. You mentioned industry standards. The industry standard is, of course, they're a lot this industry. Is anybody else really in this industry besides Amtrak? That's a very good question, Your Honor. No. What's the answer? Well, if the answer, if the industry is national passenger long-distance rail, yeah, Amtrak, since 1971, has been essentially the monopoly. When you go to short, is there only the one line? I can't remember the name of it. It's in Florida or wherever. Yes. It does have real screening. It does, Brightline. Brightline, and that's the only one in the country when you go to short. That has, like, airport-style screening, yes. However, our security expert testified that in the common carrier industry in general, it would be expected to have some form of security. It doesn't necessarily have to be wanding. He said wanding and, you know, proper screening would be good. But more than that, they can have officers. I mean, that's, in fact, that's what Mr. Mulcrone said that he thought would have been sufficient, is if they had put officers on the train. And, of course, we know from Detective Binner, who was the, practically the only officer that Amtrak had around here, that maybe once every six months or so, he'd do a ride-along. And Mr. Cook testified that that's insufficient. Is it a matter here that Mr. Webb said that it wouldn't matter if there was an officer? I mean, he was suffering from some sort of, well, mental condition. But at any rate, he testified it wouldn't matter. How do we, do we look at that at all in response to this argument? Of course. So at that point, this is a question of fact, not law anymore, right? Because we're talking now about what would have reached that duty if the court accepts they have a duty. The jury is allowed to believe or disbelieve any all part or some or none of anyone's testimony. So the jury can accept the parts of Mr. Cook's testimony that they believe. And, you know, Mr. Webb was a murderer. They don't have to believe a word Mr. Webb said. However, Mr. Webb did testify that if there had been, you know, security screening, if there had been a wand, if he had been patted down or someone had checked him beforehand, he wouldn't have boarded the train at all. And Judge Gross, you had asked before if there was evidence that the conductors knew that he himself had a gun. No, there's no evidence of that. But that evidence isn't necessary in this case. The question is whether Amtrak took reasonable steps that a reasonably prudent person would have to guard against this foreseeable danger. And viewing the evidence in the light most favorable to the jury's verdict, which of course is what the standard would be for this, there simply was – there was ample evidence that Amtrak had breached its duty. I want to briefly address, since my opponent did, this notion about Dr. Brokish's testimony about my client's survivability. You didn't ever plead lost chance of survival, right? We did not plead lost chance of survival. I don't believe there is, no. This is about medical causation, though. I mean, Amtrak – That brought it to my mind. No, we did not plead that. That is not an issue in the case. But I don't think that's relevant to this Court's analysis at this point anyway. On pages 803 to 08 of the transcript is where Dr. Brokish testifies about this. He said that in general, someone in this position would have a 4 to 14 percent chance of survival. That's true. He did say that. But then he clarified that because of Mr. Aron's age, because of the trajectory of the wound, because of how the wound impacted his heart, because of the fact that what really happened to cause his death was a reversible tension pneumothorax, which is when you have air that comes around the heart and compresses it, right? Because of all of that, in his and its physiology, the wound's physiology, he would have – there's an 80 to 90 percent chance he would have fallen into that survivable group. He said he had seen people like this survive before, and had there been prompt detention, had Amtrak – for example, there was a nurse on the train. What does that mean? There's an 80 to 90 percent chance that he would have survived? Or an 80 to 90 percent chance that he would not have been – Yeah, I mean, explain it. Sure. I'm happy to. So if you accept the subset of all individuals who are shot in this situation, 100 percent. Four to 14 percent of those survive in general. However, what Dr. Brokish testified was had Amtrak followed its policies, had there been prompt medical attention, had he been – had they looked for doctors or nurses on the train, had they called EMS, stayed there in Lee's Summit, et cetera, there is an 80 to 90 percent chance that he would have fallen within that survivable group. So what he's testifying is that – and he said it's likely. He said most likely he would have survived. They suggest in their brief that this requires him to testify it's certain, that there's certainty or it's – Under Missouri law, doesn't he have to testify that to a reasonable degree of medical certainty that but for the negligence of Amtrak, the decedent would have survived? Certainly, Your Honor. And his testimony was sufficient to meet that. Again, pages 803 to 808 of the transcript, I urge – Can you talk about medical certainty? He doesn't have to use the word medical certainty. We have cases in our brief that he said it is likely. It's more likely than not that – and he said he testified all of his – at the end, he clarified, he testified all of his conclusions were to a reasonable degree of medical certainty. And he testified, again, on pages 803 to 808, that there's – that it's likely that had this been done, Mr. Aron would have survived. I want to address, since I have some time, unless the Court has further questions about those other issues, punitive damages. My opponent didn't get into that. And, of course, this first requires the Court to accept that we – that this was foreseeable, that the claims were properly submissible, et cetera, and that Amtrak was liable. But more than just Amtrak being liable, as the jury in district court rightly saw, this evidence warranted serious punitive damages. Missouri, I grant you, it's rare in a negligence case, and rightly so, because negligence usually won't rise to this level. But Missouri allows punitive damages when a defendant shows conscious disregard or complete indifference to the health and safety of others. The evidence here is replete with this. Amtrak knew shootings on its trains were foreseeable. They tracked repeated violent crimes, and they are violent crimes regardless of how the defendants want to minimize that. They ignored their own officers' warnings. After the Lopez case, what is the closest case to this case? After the Lopez standard, you both cite pre-Lopez cases, but since Lopez, what do you think is the closest case to this on punitive damages? For Missouri, I grant the parties didn't cite this, and I took the liberty of looking some of these up, and I can send the court a letter if the court would like. Please do a 28-J letter. I will. But go ahead and tell us now, please. Sure. It's Tubbs v. BNSF, 562 Southwest 3rd, 323. That's from 2018, so it's certainly after Lopez. Is it Supreme Court or is it Court of Appeals? It is the Court of Appeals. Oh, boy, be careful when you go there in Missouri. I'm aware of the Erie Doctrine, but Tubbs follows Lopez, follows the prior cases about this.  It was a FILA case, but it was one where there was a regulation requiring a railroad, of all things, to drain water from tracks to prevent flooding. And the BNSF railroad in that case was on notice that the area flooded regularly and there was a danger of this, but they didn't do anything about it. There was evidence that they recklessly did so because they knew this policy. They were warned about this area having flooding, but they didn't follow the regulation or the policy. And as a result, a train man was injured. And the Missouri Court of Appeals authorized punitive damages in that case against the BNSF railroad for very much the same reasons. Do you recall the ratio in that case? I don't recall the ratio. So I don't think that's relevant to the ratio at this point. The ratio is different. I couldn't resist asking, proceed. Sure, Your Honor. But this case is much the same. You have repeated warnings. You have knowledge of shootings being foreseeable. And you have Amtrak, just like BNSF there, making deliberate choices to station 49 officers in Chicago and even two in Indiana to protect its property, but none, not a single one, on this place that there had been prior violent crimes. They had a firearms ban on paper. It was paper alone. But they admitted they put zero personnel behind it, no screening, not even a $30 wand. The shooter himself testified that he wouldn't have boarded with a gun if Amtrak had used one. And then when gunfire erupted, and I think this is also key, my opponent didn't mention it, and it goes to foreseeability and duty as well, that Amtrak's conductors violated, on their own admission, as Mr. Barlow said, they violated their own emergency policies. They let the train roll away from the station. They delayed investigation for 16 minutes. And they never called for medical help, even though a nurse, it turned out, was present. There was a nurse, Ms. Toth, testified at trial. Dr. Brokish. Has the nurse testified at trial? Ms. Toth. I believe she did. Okay, proceed. I didn't recall. I believe she did. Yes, Your Honor. Dr. Brokish testified, of course, that timely action would have given a high chance of survival. And finally, and this is also important, Amtrak misrepresented its own resources. They claimed they had more than 500 officers nationwide, when in fact it was 34 short of even the minimum that they were supposed to have. This is not inadvertence. This is what Missouri calls egregious conduct showing complete indifference and conscious disregard for passenger safety. And the defendants want to compare this to the Scott case. And I know, Judge Gross, you wrote the Scott case in 2024, or Lopez, which Your Honor just mentioned. But those cases are different. Those are about defendants complying with regulations with no prior warnings. And Your Honor asked, you know, is Amtrak the only thing in this industry? It's one reason perhaps Congress hasn't enacted a whole bunch of regulations, because we haven't had other passenger rail since 1971. But Amtrak has its own policies, and those are what's at issue here. This case is the opposite of Scott or Lopez. It's what punitive damages are designed for for negligence. Amtrak defied its own policies and ignored internal warnings. This is that rare negligence case that Missouri contemplates for punitive damages. And I want to note that we do cite a couple of old cases. One is the real case from the Missouri Supreme Court in 1921, where they have this example of where a man shoots a gun into a moving train, that that would be the classic example of when, you know, it's reckless conduct. It hasn't been cited in modern times though, right? Hoover's Dairy, I believe, talks about real as well. And that's pre-Lopez for sure. That's pre-Lopez in 1985. But Lopez doesn't change that standard. The point is it still remains under Lopez that if you have conscious disregard, if you have egregious conduct showing indifference and conscious disregard for passenger safety, that's sufficient. Your Honor mentioned the ratio. I have a minute left, and I do want to briefly touch on that as well. The jury, of course, here awarded $150 million in punitive damages. The district court remitted this down to 4 to 1. Constitutionally, though, the Supreme Court allows up to 10 to 1. Well, under 10 to 1. That's Campbell. That's Gore. This court in the Masters case in 2021 raised when a district court did exactly what Judge Boo did here. You have an amount. I grant you $150 million is far above the Campbell or Gore standard. And the district court had to remit that. In our briefing, we suggested the court bring it down to 9 to 1 because that would be within the constitutional standard. And Judge Boo put it down to 4 to 1. In Masters, the district court did the same thing, put it down to 4 to 1. And this court raised it back and said, well, because 9 to 1 would fit the constitutional requirements and it would equally reflect the jury's finding of reprehensibility, 9 to 1 was warranted. We submit that the same is true here. And I know that the other side's response is to point to the Andrasek case in Judge Benton. I recognize you wrote the Andrasek case where the court suggested that perhaps there is a, when you have multimillion dollar verdicts, which is not the same as Masters, I grant you, 4 to 1 might be the maximum. Although even in that case, I'll point out, Your Honor, you cited a case called Eden from this court in 2004, acknowledging where it was a multimillion dollar case where the court approved of 4.8 to 1. So at the very least, there are circumstances, even post-Campbell and Gore, where the court has approved going up. I submit to you that that's warranted here, that the court should increase the amount of punitive damages that otherwise should affirm the district court's judgment. Thank you for the argument. Thank you, Your Honors. Mr. Cuomo. Forgive me for starting my rebuttal with a question, but there are so many issues that counsel raised. Are there any in particular the court has a question about that I can focus on? If not, I will just go through the list.  So in my adversary's very eloquent presentation, I didn't hear anything about violent crimes occurring on the train. Certainly not on the Missouri River Runner. Certainly not on the Lincoln service. Daniel, you're including at least the loading area, right? You include at least, you said last time, it stuck in my mind that the premises were the rolling train. It's at least the loading area where you line up, you know, and you go up on the board and you go on the train? Because your conductors go out there. Yeah. Sure. It could be, colloquially, I would call that the platform. Is that what you're referring to? I was searching for the word. Yeah, sure. And look, let's consider, even if you consider the platform and the actual consist of the train to be the premises. Okay. Where are the violent crimes that would somehow make this assassination foreseeable? Now, I know Mr. Sternberger referred to a number of assaults, okay? What we're dealing with in this case is a gun crime, someone shot in the back. Are you familiar with the facts of the LAC case and the dissent in LAC? I am. Okay, good. I know who joined the dissent. He says that's really his best case. So, okay, let's assume that. There were 75 prior assaults on the mall and the catwalk, which is where you recall in that case, Judge, there was an abduction in the mall and then a rape outside the mall. So it is an unusual case where the court, and, you know, in that case, the majority, anyway, said that you don't have to consider identical crimes, identical locations. But that was because you had a dual location where the crime happened in that case. So crimes that happened out on the catwalk or in the parking lot were relevant to what happened in the mall. And they really focused more, and you probably recall, Judge, more specifically on crimes against women. So while the crimes weren't exactly the same, it was similar to the crime that happened in that case. So, like, a robbery or a burglary against, you know, women who frequented the mall was relevant to what happened in that case. Mr. Cuomo, I would like to have you turn to causation again if you would. Yeah, absolutely. And respond to the argument regarding the testimony of Dr. Brockish and whether his testimony satisfied Missouri law and what establishes causation. And thank you for bringing that to my attention, Judge. Judge, I was going to say there is something that counsel mentioned that I don't think is an accurate, in any way, description of the testimony. Dr. Brockish did mention an 80 to 90 percent chance that Mr. Aaron could have survived. But he was responding to something that our medical experts said. Our medical experts said that even if Mr. Aaron had been shot in a trauma emergency room, there was no chance to save him. Dr. Brockish was, I think, taken aback by that testimony. And he said, if Mr. Aaron was shot in my trauma room, my trauma emergency room, he had an 80 to 90 percent chance of surviving. That was the context of the testimony. And I can give the court the citation of that. And I've been citing things by the docket number, the docket sheet. So it's RDoC 271 at 177 to 178. That is where Dr. Brockish gave that testimony. I would invite the court to scour page 803 to 808 that my adversary cited. Nowhere does Dr. Brockish say that Mr. Aaron would have survived. And even on redirect, they asked him, has your opinion changed about his survivability? And the answer was no. It was 4 to 14 percent, period. Thank you both, counsel, for the argument. Thank you, Your Honor. Two cases, case number 24-2654 and case number 24-2693 are submitted for decision by the court. Ms. Henderson.